Alfred **LEWIS, Plaintiff-Appellant Cross-Appellee,**

v.

**TIMCO, INC., et al., Defendants-Appellees,**

v.

**JOY MANUFACTURING, Defendant-Appellee Cross-Appellant.**

No. 81–3022.

United States Court of Appeals, Fifth Circuit.

Sept. 27, 1983.

projections of occupancy or the certainty of rent collection.

Robert K. Guillory, Cornelius Dupre, II, Eunice, La., for Lewis.

Hal Broussard, Lafayette, La., for Timco, Inc.

Patrick A. Juneau, Jr., Lafayette, La., for Home Petroleum.

Robert M. Contois, Jr., Edith Brown Clement, New Orleans, La., for Atwood Oceanic, Inc.

James E. Diaz, Lafayette, La., for Rebel Rentals.

John A. Jeansonne, Jr., Lafayette, La., for Joy Mfg.

Vinson & Elkins, Charles T. Newton, Jr., Harold K. Watson, Houston, Tex., for Petroleum Equip. Suppliers Assoc., amicus curiae.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We face the question of whether the doctrine of comparative fault applies in a products liability suit maintained under the maritime jurisdiction of the federal courts. We are persuaded that it does.

I

Alfred Lewis was injured when working as a member of a crew furnished by his employer, Timco, Inc., to Atwood Oceanics, Inc. for work aboard Oceanics' drilling barge, the Vicksburg. At the time of the accident, the Vicksburg was in Louisiana's territorial waters.

Lewis operated hydraulic tongs used to "make up" tubing joints to be placed in a well. These tongs were owned and supplied by Rebel Rentals, Inc. and were manufactured by Joy Manufacturing, Inc. On the day before the accident, equipment was accidentally dropped in the drilling hole. Edwards Rental and Fishing Tools, Inc. furnished an employee to retrieve the equipment from the hole with a special fishing tool. Lewis was using the hydraulic tongs to assist in the "make up" of the fishing tool. Because of a design defect, these tongs failed to shut off when Lewis released their throttle and a snubbing cable attached to the tongs wrapped around Lewis, seriously injuring him.

A trial to the court resulted in an award for Lewis's serious and permanently disabling injuries. The trial court found multiple causes for the injury. It found that Lewis was negligent in attempting to make up the fishing tool joint without adjusting the length of the snubbing line. It found that the tongs manufactured by Joy Manufacturing had a design defect that allowed them to continue operating when the throttle was released. It also found that Rebel's representatives were negligent in failing to instruct Lewis as to the proper method of synchronizing the tong controls. Finally, it found that the Edwards employee had been negligent in not advising Lewis to shorten the snub line. The trial court apportioned 20 percent of the fault each to Joy Manufacturing and Rebel Rentals, 10 percent to Edwards Rental, and 50 percent to Lewis.

On appeal a panel of this court affirmed all but the district court's reduction of Lewis's award against Joy Manufacturing by the amount of his fault. 697 F.2d 1252 (5th Cir.1983). We granted a petition to rehear en banc the manufacturer's entitlement to the reduction. Lewis argues that Joy Manufacturing's liability for the product defect should not be reduced by that part of his injury caused by his own negligence. He argues alternatively that if comparative fault be applied the trial court's assessment of 50 percent was clearly erroneous. The panel having concluded that comparative fault was not to be applied did not reach the question of whether there was sufficient evidence to sustain that level of fault. We find that issue appropriate for decision by the panel and return the case to it for that review. We decide only that the trial court was correct in its decision that the maritime principle of comparative fault is applicable in maritime cases that urge strict liability for defects in products.

We will review comparative fault as applied under the maritime law, then turn to its application in products cases where liability rests on the principle of strict liability.[1] Finally, we will explain the basic policy choice we make. We turn first to comparative fault in maritime jurisprudence, pausing to explain our jurisdiction and the relevance of state law.

## II

The citizenship of the parties was not diverse and Lewis's suit by the time of trial was footed solely upon maritime jurisdiction. There is such jurisdiction because the injury was sustained on board a drilling barge, a "vessel," in the navigable territorial waters of Louisiana. In maritime tort cases courts traditionally apply principles of maritime law, as informed by common law tort developments, *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), unless a policy determination has been made by the Congress. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). Admiralty courts make their own decisions but, true to legal analogical processes, do so with an awareness of other courts' solutions to similar problems, sensitive to whether a "significant policy" of the state within whose territorial waters the injury occurred "would be frustrated by such an application." *See Watz v. Zapata Off-Shore Co.*, 431 F.2d 100, 113 (5th Cir.1970).

## III

Admiralty courts have long engaged in the exercise of comparing plaintiffs' negligence to both fault and non-fault based liability of defendants. For example, comparative fault is applied in the strict liability action for unseaworthiness, *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953), in personal injury actions under the Jones Act, 46 U.S.C. § 688, in actions brought under the

---

1. Products cases can rest on traditional warranty and negligence grounds as well as on strict liability. We use strict liability here to refer to those cases that rest on strict liability theories such as Restatement (Second) of Torts § 402A (1965). We already apply comparative fault in negligence cases and we see no principled distinction for doing otherwise with warranty cases. The practical result is that comparative fault will apply to all maritime products cases.

Death on the High Seas Act, 46 U.S.C. § 766, and in longshoremen's suits against vessels under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233, 1238 (5th Cir. 1977). "The admiralty rule in personal injury cases is, in effect, one of comparative negligence." G. Gilmore & C. Black, *The Law of Admiralty* 500 n. 70 (2d ed. 1975).

Lewis's desire to except maritime products cases from this consistent application of comparative fault also overlooks the fact that maritime law traditionally resists doctrinal change that might balkanize its uniformity and generality. Most notably, courts applying maritime law have repeatedly rejected choice of law notions that would reference state tort doctrines. State workers' compensation schemes were held to be inapplicable to personal injury claims arising from maritime related work on vessels in navigable waters. *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). State negligence law was held not applicable in a maritime personal injury suit, *Carlisle Packing Co. v. Sandanger,* 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922), including state law defenses of contributory negligence, *Pope & Talbot, Inc. v. Hawn,* 346 U.S. at 409–11, 74 S.Ct. at 204–06. In 1948 Congress extended admiralty jurisdiction shoreward with the Extension of Admiralty Act, 46 U.S.C. § 740, which provides that maritime jurisdiction shall include loss caused by a vessel on navigable water even if the injury is finally suffered on land. Even resort to states' wrongful death statutes ended with recognition of a general maritime law right of recovery for wrongful death. *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *see Matter of S/S Helena,* 529 F.2d 744 (5th Cir. 1976).

In sum, comparative fault has long been the accepted risk-allocating principle under the maritime law, a conceptual body whose cardinal mark is uniformity. These values of uniformity, with their companion quality of predictability, a prized value in the extensive underwriting of marine risks, are best preserved by declining to recognize a new and distinct doctrine without assuring the completeness of its fit. We are persuaded that the fit within general maritime principles of a doctrine of strict liability for defective products without comparative fault would be uneven at best.

The Death on the High Seas Act, which encompasses claims for personal injuries caused by defects in products, illustrates the problems of not recognizing comparative fault in maritime products liability cases. Under DOHSA, the court is directed to "take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly." 46 U.S.C. § 766. If Lewis's argument were accepted, when a worker's death on the high seas was caused by a defective product, the recovery would be reduced on account of the worker's negligence, but not when he was only injured. Moreover, because DOHSA applies to accidents occurring beyond a marine league from shore plaintiffs would be treated differently depending upon where a fatal accident occurred.

Other examples of its poor fit come quickly to mind in multi-party litigation so common to the admiralty practice. When a negligent plaintiff, negligent defendants, and the manufacturer of a defective product are all held jointly responsible for injuries, plaintiff's negligence would diminish his potential recovery from the negligent defendants but not from the manufacturer. If the liability was joint and several, plaintiff could recover the entire amount of his damages from the manufacturer. From the plaintiff's perspective, assuming the solvency of the manufacturer, it is as if there were no doctrine of comparative fault with respect to the negligent defendants as well. From the manufacturer's perspective, contribution might be available, but somebody would bear more than his share of the damages. In other words, erosion of the comparative fault principle, once started in the products liability field, will cut at the legs of negligence as well.

The traditional doctrine of seaworthiness will also likely be affected. If a vessel is unseaworthy because a product was defective, we will be forced to decide whether to hold the manufacturer of the product to a stricter standard of liability than the vessel owner, traditionally a near insurer in cases of unseaworthy vessels. Even more taxing will be the categorization process as seamen attempt to escape the comparative fault of the traditional theory of unseaworthiness and label their case products cases. Ultimately, there would be the inquiry of whether a vessel is not itself a product. It takes little imagination to see, indeed predict, that should we reject comparative fault, many maritime torts of our circuit will become product cases with the companion problem that the courts of this circuit would be favored over more convenient courts by seamen with a choice of forum.

While the issue seems to be open in most circuits, our decision to apply comparative fault to a strict liability case controlled by the general maritime law is supported by the only other circuit court to expressly consider the issue. In *Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129 (9th Cir.1977), the Ninth Circuit, impressed by the recent endorsement of comparative fault by state courts and by the prevalence of comparative fault in maritime law, held that the damages suffered by a plaintiff in a maritime strict products liability case could be reduced by his fault's contribution to his injury.

## IV

Lewis offers two primary reasons why strict liability and comparative fault are unsuitable partners. Lewis first argues that comparing a defendant's strict liability with a plaintiff's negligence is an "apples and oranges" effort. The argument is that while negligence focuses on a plaintiff's personal conduct, the focus of the strict products liability action is on the condition of the product and not on the conduct of the defendant. The argument continues that this difference hinders apportionment of fault in that it requires a necessarily crude and essentially arbitrary allocation, given the task of comparing incomparable ideas.

The second and related argument against comparative fault is that it requires a trier of fact to hypothesize the fault of the defendant in an unstructured way in frustration of the allocating objective of enterprise liability. That objective is to place upon the manufacturer the burden of accidental injuries caused by its products, an objective accomplished in part by a rejection of the defense of contributory negligence. *See* Restatement (Second) of Torts § 402A, Comments c and n (1965). The rationale is that the manufacturer is in a better position than the user to absorb the economic loss by spreading it throughout the chain of distribution. Eventually, the cost is passed on to society in the form of an increased cost of the product. The effect of reducing a plaintiff's recovery by the amount of his fault, the argument goes, will be to reduce or remove the manufacturer's incentive to produce safe products.

At a practical level, Lewis's argument that negligence cannot be compared to strict liability fault overlooks the fact that such comparisons were already and inevitably required in this case. Here, apart from questions of Lewis's own contribution to his injuries, the trial judge compared Joy Manufacturing's strict liability fault with the negligent fault of Edwards Rental and Rebel Rentals. In short, Lewis's proffered "conceptual problem has never bothered admiralty courts in applying the rule." Owen & Moore, "Comparative Negligence in Maritime Personal Injury Cases," 43 La.L.Rev. 942, 948 (1983).

Nor have the arguments persuaded common law jurisdictions for despite these conceptual attacks, *see, e.g., Kinard v. Coats Co.*, 553 P.2d 835 (Colo.App.1976), the majority of state courts and federal courts sitting in diversity that have faced this issue have held that comparative fault, as adopted by the legislature or the courts, should be applied to actions founded on strict products liability. Their reasoning supports the application of comparative

fault in maritime cases based on strict products liability.

Alaska was one of the first states to apply its judge-made comparative fault doctrine in a strict products liability case. In *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42 (Alaska 1976), the Alaska Supreme Court analyzed the purposes of the two doctrines and emphasized the anomalous situation that would exist "in a products liability case to have damages mitigated if the plaintiff sues in negligence, but allow him to recover full damages if he sues in strict liability, particularly where the complaint contains alternate counts for recovery in negligence, strict liability, and/or breach of warranty." *Id.* at 46 (footnote omitted). The court concluded that "the public policy reasons for strict product liability do not seem to be incompatible with comparative negligence. The manufacturer is still accountable for all the harm from a defective product, except that part caused by the consumer's own conduct." *Id.*

This court, applying Mississippi law, reached a similar result in *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276 (5th Cir.1976). The trial court there had instructed the jury to compare the conduct of the defendants and the plaintiffs, to decide if both contributed to the cause of the accident, and to then reduce plaintiff's recovery to the extent his negligence contributed to the accident. Holding that "the trial court took the correct path through the thicket of strict liability and contributory negligence," we remarked that "a noted commentator has suggested that the proper interaction between strict liability and contributory negligence 'should be apparent on reflection. It is to apply a system of comparative fault of the pure type and apply it to strict liability as well as negligence.'" *Id.* at 290

(quoting Wade, "Strict Tort Liability," 44 Miss.L.J. 825, 850 (1973)). Similarly, in *West v. Caterpillar Tractor Co., Inc.,* 547 F.2d 885 (5th Cir.1977), we held, in response to the Florida Supreme Court's answer to a certified question, that "strict liability ... lies in bystander actions, and that want of ordinary due care—in its comparative negligence form—is a defense...."[2] We thus affirmed a 35 percent reduction in plaintiff's judgment to reflect his fault.

The reasoning in *Butaud, Edwards,* and *West* was amplified by the California Supreme Court in *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). Extending its judge-made "pure" comparative fault system to strict liability cases, the court rejected the same arguments now made by Lewis and answered the suggestion that the two concepts cannot be merged:

> The inherent difficulty in the "apples and oranges" argument is its insistence on fixed and precise definitional treatment of legal concepts. In the evolving areas of both products liability and tort defenses, however, there has developed such conceptual overlapping and interweaving in order to attain substantial justice....
> We think, accordingly, the conclusion may fairly be drawn that the terms "comparative negligence," "contributory negligence" and "assumption of risk" do not, standing alone, lend themselves to the exact measurements of a micrometer-caliper, or to such precise definition as to divert us from otherwise strong and consistent countervailing policy considerations. Fixed semantic consistency at this point is less important than the attainment of a just and equitable result.

575 P.2d at 1167–68.

The court also rejected the arguments that applying comparative fault would

**2.** Nevertheless, we noted that the Florida Supreme Court had excepted plaintiffs' negligent failure to discover defects or guard against the possibility of their existence. 547 F.2d at 887 n. 2. *See West v. Caterpillar Tractor Co., Inc.,* 336 So.2d 80 (Fla.1976). This case does not present the question of whether a plaintiff's "fault" in failing to discover the defect can serve to reduce his recovery. An argument

may be made that such fault comparison is subsumed by the initial inquiry into whether a defect existed and that the concept is in actuality comparative causation. On the other hand the Ninth Circuit reached the opposite conclusion. *Pan-Alaska, ETC. v. Marine Const. & Design Co.,* 565 F.2d 1129, 1139 (1977). We leave the question to another day.

erode the protection afforded by the strict liability doctrine and reduce the incentive to produce safer products. In response to the concern that comparative fault would diminish protection of consumers, the court emphasized that plaintiffs will continue to be relieved of proving that a manufacturer or distributor was negligent and that their recovery will be reduced *only* to the extent their lack of reasonable care contributed to the injury. *Id.* at 1168. The court also reasoned that manufacturers, who cannot assume the users of a defective product to be blameworthy, will not face reduced incentives because their continuing liability for a defective product "will be lessened only to the extent that the trier finds that the victim's conduct contributed to his injury." *Id.* at 1169. Moreover, the court noted that the extension of comparative principles to strict liability actually would produce the "felicitous result" of relieving the inequities associated with absolute defenses that provide windfalls to manufacturers. *Id.*

Following the reasoning of *Daly*, the Third Circuit in *Murray v. Fairbanks Morse*, 610 F.2d 149 (3d Cir.1979) (applying Virgin Islands law) also responded to the suggestion that a trier of fact will be unable to apportion fault between a negligent plaintiff and a strictly liable defendant. Though conceding that "there is no proven faulty conduct of the defendant to compare with the faulty conduct of the plaintiff," the court noted that:

> In apportioning damages we are really asking how much of the injury was caused by the defect in the product versus how much was caused by the plaintiff's own actions.... Although fault, in the sense of the defendant's defective product or the plaintiff's failure to meet a standard of care, must exist before a comparison takes place, the comparison itself must focus on the role each played in bringing about the particular injury.

*Id.* at 159–60 (footnote omitted).

The accuracy of the court's observation in *Murray* is seen when one looks at possible jury questions. Within its broad discretion

in the manner of instructing the jury a district court might sequence Rule 49 interrogatories as follows: (1) was the product defective; (2) was it a cause of injury to plaintiff; (3) was the plaintiff at fault; (4) was plaintiff's fault a cause of plaintiff's injury; and (5) the percentage of plaintiff's injury caused by plaintiff's fault. The result then is that when the jury "compares fault" the focus is upon causation. It is inevitable that a comparison of the conduct of plaintiffs and defendants ultimately be in terms of causation. "Fault" that did not cause injury is not relevant.

An increasing number of courts have been persuaded by the policy considerations articulated in such cases as *Daly* and *Murray*. *See, e.g., Trust Corp. of Montana v. Piper Aircraft Corp.*, 506 F.Supp. 1093 (D.Mont.1981) (applying Montana law); *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854 (W.Va.1982); *Kaneko v. Hilo Coast Processing*, 654 P.2d 343 (Hawaii 1982); *Kennedy v. City of Sawyer*, 4 Kan. App.2d 545, 608 P.2d 1379, 1386 (Ct.App.), *aff'd*, 228 Kan. 439, 618 P.2d 788 (1980); *Baccalleri v. Hyster Co.*, 287 Or. 3, 597 P.2d 351 (1979). Most recently, the Texas Supreme Court in *Duncan v. Cessna Aircraft Co.*, 26 Tex.S.Ct.J. 507 (Tex. July 16, 1983) applied comparative fault to strict products liability cases despite a comparative contribution statute otherwise held inapplicable to strict liability cases. In short, at the same time that much judicial learning is moving *towards* comparative fault in strict liability cases, Lewis would have us abandon those principles in the maritime law.

Finally, we inquire whether any strong policy of Louisiana, in whose territorial waters this accident occurred, would be frustrated by adopting comparative fault in maritime products cases. While Louisiana courts do not appear to have applied comparative fault principles to strict products liability cases, the state has no "significant policy" against doing so. Its legislature adopted a comparative fault statute that became effective on August 1, 1980. *See* Acts 1979, No. 431 (amending LSA–C.C.

Art. 2323). Unlike some comparative fault statutes that expressly apply only to actions based upon negligence, *see e.g., Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okl. 1974), Louisiana's statute applies "[w]hen contributory negligence is applicable to a claim for damages." It proportionately reduces recovery when "a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons. . . ." LSA–C.C. Art. 2323. We have recently certified to the Louisiana Supreme Court the question whether Louisiana law recognizes contributory negligence as a defense to a products liability action, *see Bell v. Jet Wheel Blast*, 709 F.2d 6 (5th Cir.1983). *See also Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614 (5th Cir.1983); Plant, "Comparative Negligence and Strict Tort Liability," 40 La.L.Rev. 403 (1980). While we may be uncertain in this reading of Louisiana law, we are confident that recognition of comparative fault in products cases will not "frustrate" a dedicated policy of Louisiana.

### V

It is relevant to an analysis [3] of how a rule allocates liability for accident losses resulting from use of a product to consider: (1) short-term and long-term cost; (2) amount of use of the product in the economy or "activity"; and (3) cost of administering the rules of liability. It is relevant because fault has both an ethical and an efficiency dimension. The latter is expressed by asking which party can prevent the injury at the least costs.

The short-term costs are the immediate expenditures to avoid accidents as well as the immediate costs of accidents themselves. Of course the two primary actors influenced by the rule choice are the manufacturer and the user. The manufacturer

will alter its product to avoid an accident if the manufacturer's share of the expected cost of the accident (coverage cost times the probability it will occur) exceeds the cost of altering the product. A system of strict liability with comparative fault includes in the manufacturer's share of the accident costs only those costs caused by product defects. In that case the manufacturer will have the correct economic incentive to adjust the design of the product to minimize accident costs caused by the design. A system of strict liability with no comparative fault would add to the manufacturer's share those accident costs caused by negligent use and not by any product defect. This increase in the manufacturer's share would result in an increased, and therefore inefficient, level of expenditures on preventive measures.

The situation with respect to the user's expenditures is precisely complementary. The user will intentionally alter his use of the product only if his perceived cost of altering his use to avoid an accident is less than his expected cost from an accident resulting from his failure to alter his behavior. The inclusion of comparative fault will affect user behavior in a manner that results in a more efficient utilization of resources. Under simple strict liability, as proposed by the plaintiff, the user has no economic incentive to avoid an accident that he could avoid more cheaply than the manufacturer.

Besides affecting long-term research for safe products and the immediate decisions on how much to invest in preventive measures, rules of liability affect the level of product use. When the liability for blameless accidents is placed on the manufacturer, the price of products whose use results in high accident costs will go up relative to

---

**3.** The "analysis" of part V presents nothing novel. It describes what maritime jurists intuitively sensed long ago. We do no more than talk in an analytical way about judgments intuitively made. Because stated rationale is a hallmark of our work, we believe the effort worthwhile, despite its rudimentary character. We suggest no decisional calculus. Instead we only acknowledge that such inquiry adds light

to the problem at hand. While ultimately choices among potential tort rules may turn on notions of "fairness" as viewed through the eyes of each judge's ethical regimen, those choices will only be guesses if the judges are inadequately informed of their impact. *See Dobson v. Camden*, 705 F.2d 759, 775 n. 1 (5th Cir.1983).

those whose use results in small accident costs. The use of the comparative fault standard reduces the risks of non-negligent users indirectly paying for negligent users. The comparative fault standard allows the price of the product to reflect the cost of its non-negligent use. Hence a comparative fault standard allows the economically efficient amount of the product to be used. If, for example, the use of a particular piece of equipment has resulted in several costly accidents due to the negligence of the user, the cost of the product will not be driven up because of the expected cost of accidents for which the producer will be or has been liable. The producer will not have to charge non-negligent consumers a premium to cover the liability from accidents by negligent users. The proper use of a safe product will not be stifled by negligent use.

The final economic consideration in choosing a rule of liability is the cost of administering the system. It might appear that strict liability without comparative fault would be less expensive to administer both because it simplifies the issues at litigation and because it removes uncertainty thereby facilitating settlements, which are cheaper than trials. *But see United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 408 n. 13, 95 S.Ct. 1708, 1714 n. 13, 44 L.Ed.2d 251 (1975). The matter, however, is more complex: by increasing the certainty of victory, if it does, strict liability may increase the plaintiff's willingness to spend money on litigation and decrease his willingness to settle. There is no indication that strict liability with comparative fault would increase cost.

## VI

We are persuaded that general considerations of fairness and efficiency support a comparative fault defense in products liability actions. In maritime suits, these considerations are bolstered by the historical reliance on comparative fault as integral to an essentially uniform and unitary body of law. We hold that it governs here, AFFIRM the district court's application of maritime principles of comparative

fault, and RETURN the case to the panel for its review of Lewis's assertion that the level of found fault was not supported by the evidence.

POLITZ, Circuit Judge, with whom JOHNSON and JERRE S. WILLIAMS, Circuit Judges, join, dissenting:

Believing the majority opinion to be at odds with the principles underlying strict liability, I respectfully dissent. Though mindful of Justice Holmes' observation that the law is grounded in experience, not logic, *Holmes, The Common Law,* p. 1 (1881), I am not convinced that this case obliges us to ignore the logic underpinning the tort principles pertinent to the issue before us. I perceive strict liability and comparative fault as incompatible concepts.

### Strict Liability

Strict liability is not a development in the law of negligence; it evolved separately. *See, Prosser, The Law of Torts* § 98 (4th ed. 1971). *See also, Powers, The Persistence of Fault in Products Liability,* 61 Tex. L.Rev. 777 (1983). Strict liability for goods derives from the law of warranty. *See McPherson v. Buick,* 217 N.Y. 382, 111 N.E. 1050 (1916), and its progeny. Strict liability for unseaworthiness in maritime law arose from the concept of an implied warranty of seaworthiness by the owner of the ship: "It is essentially a species of liability without fault ... the liability is neither limited by conceptions of negligence nor contractual in character ... [i]t is a form of absolute duty owing to all within the range of its humanitarian policy." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94–95, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1945). The concepts of maritime strict liability and products strict liability are both based on the concern that the injured party cannot adequately protect himself from the potential harm. *Compare Sieracki* with *Greenman v. Yuba Power Products,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963).

Strict liability is based on a theory of responsibility which requires no finding of fault. The law of strict liability, applicable in some form in most American jurisdic-

tions, is succinctly stated in *Restatement (Second) of Torts*, § 402A (1965).[1] The Comments to the Restatement note that "the rule applies although [the party] has exercised all possible care." *Restatement (Second) of Torts*, § 402A, Comment a, p. 348. The Comments further note that this action is an alternative to negligence. The elements of a strict liability action are (1) injury, (2) defect, and (3) a causal tie between the two. *Burks v. Firestone Tire & Rubber Co.*, 633 F.2d 1152 (5th Cir.1981).

A negligence action focuses on conduct, specifically the quality of the act causing the injury; a strict products liability action focuses on the product itself. The moving force behind the strict products liability concept is the determination to reduce the risks defective products impose on society. The rise of strict liability in products liability actions results from the perception that the manufacturing enterprise can best carry the cost of injuries occasioned by defective products as an element of product cost.[2] Strict liability concerns itself with the relationship between the manufacturer and society as a whole. The relationship between specific plaintiffs and defendants is of secondary importance; it is considered subservient to the interest of the public as a whole.[3] No fault automobile insurance is an example of the operation of this policy outside the area of products liability. *See e.g., Calabresi, Costs of Accidents* (1971).

### Comparative Fault

Fault is blameworthiness. " 'Fault' in legal literature is the equivalent of negligence." *Continental Insurance Co. v. Sabine Towing Co.*, 117 F.2d 694, 697 (5th Cir.1941). The concept of fault in negligence law presupposes a particular duty or obligation to conform to a certain standard of conduct and focuses upon the nature of the act itself. It notes only inferentially the instrument the actor uses to bring about the result and the result itself.

That the fault of two parties in an action can be compared is well accepted in the law, serving as the basis for both comparative negligence and contribution statutes. The latest wisdom on the subject is the Uniform Comparative Fault Act (1977). Courts have had no particular difficulty determining relative degrees of fault between multiple parties when the liability for all parties is based in negligence. *See, e.g., Shows v. Jamison Bedding, Inc.*, 671 F.2d 927 (5th Cir.1982); *Cruthirds v. RCI, Inc.*, 624 F.2d 632 (5th Cir.1980). The addition of a strictly liable party to the calculus of responsibility significantly changes the problem. It becomes necessary to devise an equitable method for apportioning liability.

1. § 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
   (a) the seller is engaged in the business of selling such a product, and
   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
   (a) the seller has exercised all possible care in the preparation and sale of his product, and
   (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

2. " . . . the purpose of such liability is to insure that the costs of injury resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *Greenman v. Yuba*, 59 Cal. 57, 63, 27 Cal.Rep. 697, 701, 377 P.2d 897, 901 (1963).

3. As a policy matter, strict liability in products cases deals with enterprise responsibility; "public policy demands that the burden of accidental injuries caused by products intended for consumption be placed on those who market them, and be treated as a cost of production against which liability insurance can be obtained." *Restatement (Second) of Torts*, § 402A, Comment L. *See also, Elmore v. American Motors Corp.*, 70 Cal.2d 578, 70 Cal.Rptr. 652, 451 P.2d 84 (1969); *Klenne, The Enterprise Liability Theory of Facts*, 47 U.Colo.L.Rev. 153; *Traynor, The Ways and Means of Defective Products and Strict Liability*, 32 Tenn.L.Rev. 363 (1965).

### Fault Comparison Dilemma

Although fault may be present, there is no requirement of traditional fault in a strict liability situation. The theory of strict liability does not lend itself to a comparison of fault. Some courts and commentators have characterized the attempt as involving "apples and oranges."[4] A more accurate analysis might characterize the effort as an attempt to measure the amount of water in an empty glass. I find it simply illogical to attempt to quantify fault where admittedly none exists.

Beyond this pragmatic question of comparison, the exercise erodes the theory of strict liability. If a defendant liable under a strict liability rule can mitigate damages by showing the plaintiff's fault, then the plaintiff will be forced to show the defendant's "fault" in order to lessen by comparison his own. This inappropriately reintroduces the element of fault into a strict liability action.

Courts and commentators have consistently emphasized the discreteness between remedies in strict liability and in negligence.[5] Not infrequently, different remedies result in different recoveries. That a plaintiff might recover more damages in a strict liability suit than he would in a negligence suit does not justify impressing negligence concepts on a strict liability action.[6]

Strict liability, as I perceive it, allows a plaintiff in certain situations to escape his own negligence, a reality factored into the construct of the policy. The panel opinion in this case, now vacated, would have limited the type and extent of negligence which would be so held for naught.[7] The adoption of § 402A or some variation of it, implicitly includes the determination, as a matter of policy, that the risk of damages should fall upon the strictly liable party. At the peril of oversimplification, I suggest the real decision we face today is whether to accept strict liability, specifically strict products liability, as meritorious and apply it without reducing plaintiff's recovery for simple negligence, or to signal the demise of strict liability as a basis for legal accountability in tort.

### Comparative Fault and Strict Liability Maritime Actions

Admiralty law allows two distinct remedies for injury: negligence and unseaworthiness, a type of strict liability. *Pope & Talbot v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). Admiralty law also recognizes the concept of comparative fault. That comparative fault is applicable to all cases of strict liability in admiralty is not set forth in bright letters. Generally, in cases where comparative fault has been applied in admiralty, the defendant has been found negligent instead of or in addition to being found strictly liable for unseaworthiness. This was true in both cases cited by

4. *See, e.g., Daly v. General Motors Corp.,* 20 Cal.3d 725, 762–63, 575 P.2d 1162, 1184, 144 Cal.Rptr. 380, 403 (1978, Mosk, J., dissenting); *Robinson, Square Pegs (Products Liability) In Round Holes (Comparative Negligence),* 52 Cal. St.B.J. 16 (1977); *Note, Products Liability, Comparative Negligence, and the Allocation of Damages Among Multiple Defendants,* 50 S.Cal.L.Rev. 73, 102 (1976).

5. This is clearly expressed in the comments to *Restatement (Second) of Torts,* § 402A, Comment a (1965). *See also, Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1963); 1 R. Hursh & H. Bailey, American Law of Products Liability § 4:41 (2d ed. 1974); Prod.Liab.Rep. (CCH) § 4016 (1981).

6. This point has bothered at least one court, and apparently significantly contributed to its finding of a basis of comparison: "[I]t would be anomalous in a products liability case to have damages mitigated if the plaintiff sues in negligence, but allow him to recover full damages if he sues in strict liability." *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42, 46 (Alaska 1976).

7. I go no further than those situations in which the plaintiff's "fault" is grounded in simple negligence. 697 F.2d at 1255. This is an altogether different situation from one where the plaintiff "assumes the risk" and voluntarily and unreasonably proceeds to encounter a known danger. The position of the Restatement is that contributory negligence is not a defense to strict liability whereas assumption of risk is. *Restatement (Second) of Torts,* § 402A, Comment n (1965).

the majority for the proposition that comparative fault is applied in unseaworthiness cases. *Id.* at 408, 74 S.Ct. at 204; *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir.1977).

The Ninth Circuit is the only circuit to face squarely the issue of comparative fault in strict liability admiralty cases. *Pan-Alaska v. Marine Construction & Design Co.,* 565 F.2d 1129 (9th Cir.1977). The majority endorses this opinion. I do not believe this case comports with the underlying principles of strict liability reflected in § 402A, a section oft cited in maritime opinions. *See, e.g., McCune v. F. Alioto Fish Co.,* 597 F.2d 1244 (9th Cir.1979); *Lindsay v. McDonnell-Douglas Aircraft Corp.,* 460 F.2d 631 (8th Cir.1972). The *Pan-Alaska* court cites several cases to support its conclusion. I find those cases at variance with § 402A strict liability.

In *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court was confronted with the application of Wisconsin's comparative negligence statute as a defense to strict liability. The court analyzed strict liability as "akin to negligence per se." *Id.* 155 N.W.2d at 64. This analysis, however, stands at odds with the standard definition of strict liability which assumes that no determination of fault is necessary. This decision has not commanded a broad following.[8]

In *Sun Valley Airlines v. Avco-Lycoming, Inc.,* 411 F.Supp. 598, 602 (D.Idaho 1976), the court found that, "[a] concept fundamental in tort law is that in order for liability to lie, there must be a wrongdoer whose actions violate a duty owed . . . whether it be labeled negligence or strict liability, is blameworthy or culpable conduct . . . [a] violation of that duty constitutes blameworthiness or culpability or sense of legal fault." Obviously the court implied the element of fault in strict liability. I find this implication at odds with the generally accepted view of strict liability.

In *Hagenbuch v. Snap-on Tools Corp.,* 339 F.Supp. 676 (D.N.H.1972), the court found assumption of risk to be a defense to strict liability. The plaintiff there was injured when a hammer chipped and the chip pierced his eye. The plaintiff was aware that the hammer had chipped previously. This case involves assumption of risk, an altogether different animal from comparative negligence. In the traditional assumption of risk situation, the plaintiff, "aware of a risk already created by the negligence of the defendant, proceeds voluntarily to encounter it." *Prosser, The Law of Torts,* p. 440 (4th ed. 1971). That is not the factual situation presented in the case at bar.

In *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42 (Alaska 1976), the Supreme Court of Alaska applied comparative negligence in a strict liability case, stating "[a]lthough it is theoretically difficult for the legal purist to balance the seller's strict liability against the user's negligence, this problem is more apparent than real. . . . It is not anticipated that the trier of fact will have serious difficulties in setting the percentage that the damages would be reduced as a result of the comparative negligence of the plaintiff." *Id.* at 45–46. I cannot agree. This is more than simply a problem of "legal purity." It presents a very practical problem which the court does not address. Comparative fault assumes a real comparison. The percentage of the plaintiff's fault is determined *in relation to* the defendant's fault. The amount of fault of a plaintiff is not determinable in a vacuum; it can only be measured as against the culpability of the defendant. I struggle to understand how the fact-finder can appreciate and apply the concept of liability without fault and, at the same time, compare relative percentages of fault when one of the parties is perhaps free of fault. It appears that the fact-finder will be forced to make an *ad hoc* determination of presumed fault on the part of the strictly

---

**8.** The Supreme Court of Wisconsin reiterated this analysis in *Powers v. Hunt Wesson Foods,* 64 Wis.2d 532, 219 N.W.2d 393 (1974). Only two other courts have favorably commented on this case. *Haney v. International Harvester Co.,* 294 Minn. 375, 201 N.W.2d 140 (1976); *Ritter v. Narragansett Elec. Co.,* 109 R.I. 176, 283 A.2d 255 (1971).

liable party and then factor this into a calculus of relative responsibility.

The final case cited in *Pan-Alaska* is our decision in *Edwards v. Sears Roebuck & Co.,* 512 F.2d 276 (1975). In *Edwards* we found no error in jury instructions which permitted a reduction in recovery commensurate with the decedent's contributory negligence. *Edwards* has been viewed by some courts and commentators as standing for the proposition that comparative fault is applicable in strict liability cases.[9] In *Edwards* we may have been intuitively groping for something else—perhaps the embryonic formulation of a causal apportionment standard.

I am persuaded, as earlier stated, that *Pan-Alaska* is inconsistent with the purpose and rationale of strict liability. I would not make its holding the law in this circuit. To do so further exacerbates the problem courts have had in distinguishing strict liability from negligence.

### The Sea and Comparative Negligence

The court today is of the opinion that the Jones Act, 46 U.S.C. 688, and the Death on the High Seas Act (DOHSA), 46 U.S.C. § 766, permit, perhaps invite, the application of comparative negligence principles in a strict liability case. I cannot agree.

The doctrine of unseaworthiness has been a part of our maritime law since *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). Whether this concept was based on strict liability, negligence, or a hybrid of the two was the subject of a lengthy, intense debate. It was not until 1943 that the Supreme Court ended the confusion by holding that the doctrine of unseaworthiness exists independent of the doctrine of negligence. *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1943). Until 1958, unseaworthiness was an alternative remedy to a Jones Act negligence action and a plaintiff was obliged to opt between the two. *McAllister v. Magnolia Petroleum Co.,* 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958). Today a plaintiff may plead both, but as separate actions. In recent times, the Supreme Court recognized the doctrine of seaworthiness as a derivative remedy under DOHSA. *Moragne v. State Marine Life,* 398 U.S. 375, 396 n. 12, 90 S.Ct. 1772, 1785 n. 12, 26 L.Ed.2d 339 (1970), affirming earlier dictum in *Kernan v. American Dredging Company,* 355 U.S. 426, 430 n. 4, 78 S.Ct. 394, 397 n. 4, 2 L.Ed.2d 382 (1958). In 1920, during the period of confusion and uncertainty, DOHSA and the Jones Act were enacted. It cannot be gainsaid that the remedies made available by the Jones Act and DOHSA have been largely the product of judicial articulation. An examination of these statutes reflects that comparison of fault in strict liability maritime actions is not statutorily ordained. That we would now formulate a standard in maritime law consistent with general tort principles, one that rejects comparative fault in strict liability products cases, to me would be neither inconsistent nor untidy. I find nothing implicit in maritime law compelling the opposite result.

In maritime torts, courts have traditionally applied common law rules, *Sea-Land Services v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), with an awareness of the solutions to similar problems by other courts, *see Watz v. Zapata Off-shore Company,* 431 F.2d 100 (5th Cir.1970). While an occasional opinion may doubt whether admiralty will enforce strict liability, *see, e.g., Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745 (4th Cir.1975), the pervasive trend in American admiralty law is to acknowledge and incorporate it. I am convinced that we should adopt, in admiralty law, tort principles consistent with the general law.

---

**9.** It should be noted further that in this case we made the assumption that Mississippi law would follow the urgings of Professor Wade in his article "Strict Tort Liability" 44 Miss.L.J. 825, 850 (1973), which advocated the use of comparative fault principles to strict liability actions. However, since Professor Wade based his contention on the Wisconsin case of *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967), a case which does not command a wide following and has been rejected outright by some courts, it is at least somewhat questionable whether Professor Wade's analysis would be followed by the Mississippi court today.

If strict liability is a socially justifiable method of allocating responsibility, then the results flowing from it for the assessment of damages should be accepted as concomitantly just.[10]

### Comparative Causation as a Basis of Apportioning Responsibility

I am not persuaded to the majority's view, but I would agree that some assessment of comparative responsibility may be made in this case. I find that causal apportionment[11] offers a fair and equitable resolution of this thorny issue. The operative element in every strict liability action, after the defective product, hazardous activity, or unseaworthiness is found, is the causal connection between that fact and the injury. If the plaintiff's actions are blameworthy and helped cause the result, an appropriate reduction in recovery would seem in order. The focus of the inquiry should be the causal relationship between the plaintiff's conduct and the injury, not on the normative aspects of the plaintiff's conduct.

In an action against a strictly liable defendant, there must be an equitable reason for mitigating a plaintiff's recovery when the policy for allowing it in the first place is a belief that the enterprise should bear the costs for the injuries it inflicts through its products. I would suggest that a threshold assessment of the plaintiff's fault be made as part of the determination whether damages should be mitigated. The actual comparison for mitigation purposes would be based on how much the plaintiff contributed to the cause of the accident, not on how blameworthy the plaintiff was. If the plaintiff is found free of fault there would be no reduction and the strictly liable party would bear all of the costs, despite a shared causation. This approach would equitably apportion responsibility consistent with the policies of strict liability.

There is nothing novel or unusual about using causation to gauge liability. *See, e.g., In re Polemis & Furness, Withy & Company,* 3 K.B. 560 (1921). The civil law has long recognized causation as a basis for allocating responsibility. *See* Lawson & Markesinis, Tortious Liability for Unintentional Harm in the Common Law and the Civil Law, pp. 106–142 (1982). Moreover, the use of causal influence as an element of comparative responsibility is acknowledged in the Uniform Comparative Fault Act, *see* Comment to § 2(b) of UCFA (1977).

Can the average fact-finder apportion causation? I think so. I am convinced that judges and juries would have no more difficulty determining causation than they do

---

**10.** Whether strict liability is a fair and just standard of allocating responsibility is the subject of a lively debate. *See, e.g., Epstein, A Theory of Strict Liability,* 2 J. Legal Stud. 151 (1973); *Epstein, Defenses and Subsequent Pleas in a System of Strict Liability,* 3 J. Legal Stud. 165 (1974); *Fletcher, Fairness and Utility in Tort Theory,* 85 Harv.L.Rev. 537 (1972); *Schwartz, The Vitality of Negligence and the Ethics of Strict Liability,* 15 Ga.L.Rev. 963 (1981). Unless, however, we determine to abolish strict liability as a basis of liability, we should accept the logical conclusions of its results as just.

**11.** I do not share the majority's view that fault and causation are the same thing and consider it important to distinguish between them. Fault relates the specific act to responsibility. *See, generally, Prosser, The Law of Torts,* (4th ed. 1971) ch. 5. The question posed is whether the act itself is less than the standard required by law. Causation relates the act to the result.

*See, generally, Hart and Honore, Causation in the Law,* 1959; *Becht and Miller, The Test of Factual Causation,* 1961; *Malone, Ruminations on Cause-in-Fact,* 9 Stan.L.Rev. 60 (1956); *Green, The Causal Relation Issue in Negligence Law,* 60 Mich.L.Rev. 543 (1962). Questions of causation are not based on the normative analysis of the quality of the act, but are focused on whether there is a nexus between the act and the result. Fault and causation are not interchangeable terms. *Prosser, The Law of Torts,* (4th ed. 1971) p. 142.

The possible jury instructions suggested by the majority reflect the inherent confusion in the two concepts. Under the charge the jury would be asked "was plaintiff's fault a cause of plaintiff's injury?" I perceive the appropriate question to be "was plaintiff's act or forbearance which you find blameworthy part of the cause of the injury? If so, what percentage of the cause do you find.?" The focus should be on the act itself, not on a normative evaluation of the quality of the act.

with culpability.[12]  I am aware, however, of an academic debate of substantial proportions on this question.[13]

I would not reduce the plaintiff's recovery based on an evaluation of his negligence in the use of the faulty product.  But I would not be adverse to permitting the manufacturer to reduce the amount of damages by first showing plaintiff's fault and then showing the extent to which Lewis' actions actually caused the injuries he sustained.  This may be viewed as a mere difference in semantics from the holding of the majority; I do not think so and respectfully dissent.

---

12.  Psychologists have determined that causality is one of the first concerns the human mind learns to grasp, and that this is developed before the intellectual development of the understanding of moral culpability.  *See, e.g., Piaget, The Child's Conception of Physical Causality* (1960).

Although sophisticated academic formulations have been devised, *see, e.g., Rizzo & Arnold, Causal Apportionment in the Law of Torts: An Economic Theory,* 80 Col.L.Rev. 1199, legal scholars acknowledge that ordinary people make such determinations in their normal course of life, *Hart & Honore, Causation in the Law,* ch. II (1959).

13.  *See, e.g., Epstein, A Theory of Strict Liability,* 2 J.Leg.Stud. 151 (1973); *Epstein, Defenses and Subsequent Pleas in a System of Strict Liability,* 3 J.Leg.Stud. 165 (1974); *Epstein, Intentional Harms,* 4 J.Leg.Stud. 391 (1975); *Borgo, Causal Paradisms in Tort Law,* 8 J.Leg. Stud. 419 (1979); *Note, Comparative Causation, Indemnity, and the Allocation of Losses Between Joint Tortfeasors in Products Liability Cases,* 10 St. Marys L.J. 587 (1979); *Twerski, The Many Faces of Misuse: Inquiry into the Emerging Doctrine of Comparative Causation,* 29 Mercer L.Rev. 403 (1978).